UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:11-cv-00217-FL

| | | |
|---|---|---|
| RACHEL MCBROOM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| UNIVERSITY OF NORTH CAROLINA – | ) | |
| PEMBROKE, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion for summary judgment,
pursuant to Rule 56 of the Federal Rules of Civil Procedure (DE # 25). Plaintiff responded in
opposition to the motion (DE # 29), and defendant filed a reply (DE # 30). The issues raised are
ripe for ruling, and, for the reasons that follow, defendant's motion for summary judgment will
be granted.

**STATEMENT OF THE CASE**

Plaintiff alleges two causes of action in her amended complaint: 1) that defendant
discriminated against her on the basis of her gender, in violation of Title VII of the Civil Rights
Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; and 2) that defendant retaliated against her
after she filed a charge of discrimination against defendant with the Equal Employment
Opportunity Commission ("EEOC"), in violation of Title VII. Defendant answered the amended
complaint, denying liability. Following discovery, defendant filed the instant motion for
summary judgment, arguing, *inter alia*, that plaintiff has not produced sufficient evidence of
discrimination or retaliation to submit her claims to a jury. Plaintiff responded in opposition,

arguing that she has alleged a *prima facie* case of discrimination and retaliation and that whether the motivation for defendant's actions was discriminatory is a jury question. Defendants timely replied.

## STATEMENT OF THE FACTS

The undisputed facts, viewed in the light most favorable to plaintiff, are as follows. In August 2003, plaintiff was hired as a full-time instructor in the Department of Biology at the University of North Carolina at Pembroke ("UNCP"). In addition to working as an instructor, plaintiff also performed the duties of the director of the Science Education programs. The director position was officially held by another faculty member, because the director was required to hold a Ph.D., and at that time plaintiff was enrolled in a Ph.D. program at North Carolina State University, but had not yet received her doctoral degree. Plaintiff was given an unrequested, paid leave of absence for the Spring 2008 semester so that she could work on her Ph.D., but she did not complete her degree at that time.

In March 2009, plaintiff was informed by Dr. David Zeigler, the chair of the Department of Biology, that UNCP policy prohibited a person from being employed as an instructor for more than seven (7) years. At that time, plaintiff was in her sixth year as an instructor. In a July 27, 2009 letter from Dr. Zeigler to plaintiff, he informed her that she needed to finish her Ph.D. by the end of the 2009-10 academic year, which would be her seventh year as an instructor, and that, if she did so, she would be promoted to assistant professor. The letter also stated that if she failed to timely complete her degree, then an open search would be conducted for the assistant professor position, but that she might be rehired as a lecturer.

In October 2009, plaintiff informed Dr. Zeigler that she was pregnant and wanted to avoid teaching any introductory biology labs, where she would be exposed to chemicals.

2

Plaintiff and Dr. Zeigler agreed on a schedule to address her concerns and to allow her to complete her duties prior to her April 2010 due date. Plaintiff did not request paid leave for the Spring 2010 semester because, at the time, she was unaware that UNCP had adopted a policy providing for paid maternity leave to faculty. When plaintiff was hired, paid maternity leave was unavailable to faculty. However, in 2004, the faculty at UNCP adopted a Faculty Serious Illness Leave ("FSIL") policy, which provided for, among other things, paid leave for faculty contingent upon approval by the department chair, dean, and provost, "to exercise primary responsibility for the care of an infant immediately after the birth." UNCP Faculty Handbook § 3-12.E.1(j), Decl. of Pamela L.A. Barkett ("Barkett Decl.") Ex. 1 (DE # 25-3).

In early February 2010, plaintiff learned of the FSIL policy and that UNCP had provided paid maternity leave to other female faculty members. On February 12, 2010, plaintiff sent a letter to Dr. Zeigler requesting paid leave for the Fall 2010 semester, beginning on August 15, 2010. Dr. Zeigler responded to plaintiff by email of February 15, 2010, indicating that if she finished her Ph.D. by the end of the academic year, he would approve her request, but that if she failed to timely complete her degree, her employment status would be uncertain and that she may want to investigate whether a lecturer was entitled to leave, paid or not.

In March 2010, plaintiff informed Dr. Zeigler that she might not complete her Ph.D. by May 2010, but that she could do so by August 2010. Dr. Zeigler responded by email dated March 11, 2010, explaining the situation as he understood it–that the provost would not approve a leave period for her; that if she completed her degree by May 2010, she would be given the assistant professor title without an open search; that if she did not timely complete her Ph.D., her employment in her current position would end; and that, if she later completed her Ph.D., she could apply for the assistant professor position and may be rehired. Dr. Zeigler subsequently

3

received authorization to extend plaintiff's deadline for completing her Ph.D. to August 11, 2010, and so informed her by email of March 22, 2010. He also stated that the status of her leave request, while still doubtful, could be further discussed in the event she timely completed her Ph.D. Dr. Zeigler and Dean Slann further memorialized plaintiff's status in an April 7, 2010 letter.

On May 6, 2010, Dr. Zeigler emailed plaintiff her annual evaluation. He ranked her performance as "adequate" and recommended a "medium" merit salary increase. However, there was no money available to fund merit salary increases in 2010. Dr. Zeigler explained that plaintiff had two primary directives–attending to her duties as Undergraduate Science Education Coordinator and completing her Ph.D.–and while she had excelled in the first directive, she had not finished her Ph.D., despite repeated reminders by administrators that she needed to finish and assurances by plaintiff that she would do so. Dr. Zeigler also commented that, for a period during the Spring semester, plaintiff did not work cooperatively with some of the other faculty involved in the Science Education program and that she has generated some problems requiring significant amounts of his time to resolve. The previous year, Dr. Zeigler had ranked her performance as "very good" and had recommended a "high" merit salary increase.

Plaintiff requested clarification regarding the problems Dr. Zeigler stated that she had generated, and Dr. Zeigler responded that, as a result of her nearing the end of her seven years as an instructor without having finished her Ph.D., he had been required to engage in lengthy consultation with other administrators, to spend time drafting communications to plaintiff, and to deal with staffing uncertainties. Dr. Zeigler specifically mentioned plaintiff's request for leave as a complicating factor.

4

On June 4, 2010, Dr. Zeigler requested a progress report from plaintiff regarding the completion of her Ph.D. and reiterated that if she did not timely finish, she may be unemployed for the coming Fall semester, or may possibly be offered a one-year lecturer position. On June 11, 2010, plaintiff filed an EEOC charge, alleging that the lower rating on her annual evaluation was due to sex discrimination and that she was given a less than favorable performance evaluation because she requested paid maternity leave.

On June 30, 2010, plaintiff provided an update to Dr. Zeigler, explaining that she was continuing to work towards meeting the August 11, 2010 deadline and that she would provide another update at the end of July. On July 20, 2010, plaintiff informed Dr. Zeigler that she would not complete her Ph.D. by August 11, 2010, and she subsequently was offered a one-year position as a lecturer, which she accepted on July 22, 2010. In response to an inquiry from Dr. Zeigler as to course assignments for the Fall, plaintiff stated that she was renewing her request for paid leave for the Fall 2010 semester. On August 4, 2010, plaintiff was notified by Interim Provost Dr. William Gash that her request for paid leave under the FSIL policy was denied. She was reminded that she could apply for FMLA leave without pay.

On August 27, 2010, Dr. Zeigler informed plaintiff that he had initiated a search for the assistant professor position and that he assumed she would apply and would need to have her Ph.D. completed by the time the position posting closed in mid-October to be considered. Dr. Zeigler communicated with plaintiff as to the status of the search again on November 2, 2010, and November 10, 2010. Plaintiff submitted an application for the position on November 15, 2010, and on November 30, 2010, she informed the chair of the search committee that the final defense of her dissertation had been scheduled for December 13, 2010. On December 3, 2010, Dr. Zeigler informed plaintiff by email that one candidate had been scheduled for an interview

5

during the week of December 6, but that there had not yet been a decision regarding who the other two candidates would be. Plaintiff successfully defended her dissertation on December 13, 2010.

Plaintiff filed a second EEOC charge on December 22, 2010, alleging that UNCP had retaliated against her because she had filed the earlier charge in June 2010. She alleged that Dr. Gash had denied her request for paid leave; that Dr. Zeigler had accelerated the search for the assistant professor position in order to prevent her from applying; and that Dr. Zeigler had created a hostile work environment. On January 28, 2011, plaintiff submitted her resignation from her position as a lecturer at UNCP, effective February 13, 2011, because she had accepted a position with the Department of Public Instruction, to begin on February 14, 2011. Plaintiff was contacted by the chair of the search committee in late February 2011, asking if she was still interested in the assistant professor position, and plaintiff responded that she had withdrawn her application. UNCP ultimately hired a woman for the position on August 11, 2011.

On March 7, 2011, the EEOC issued a Determination Letter regarding plaintiff's gender discrimination claim against UNCP, finding that defendant plaintiff was given a less than favorable evaluation because of her gender and pregnancy, in violation of Title VII. The EEOC attempted conciliation, which was unsuccessful, and subsequently issued a right to sue letter for both plaintiff's gender discrimination and retaliation claims.

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986) (holding that

6

a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only

if there is sufficient evidence for a reasonable jury to find for the non-moving party).  The party

seeking summary judgment bears the initial burden of demonstrating the absence of any genuine

issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving

party has met its burden, the nonmoving party then must affirmatively demonstrate with specific

evidence that there exists a genuine issue of material fact requiring trial.  Matsushita Elec. Indus.

Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

Summary judgment is not a vehicle for the court to weigh the evidence and determine the

truth of the matter, but rather contemplates whether a genuine issue exists for trial.  Anderson,

477 U.S. at 249.  In making this determination, the court must view the inferences drawn from

the underlying facts in the light most favorable to the nonmoving party.  United States v.

Diebold, Inc., 369 U.S. 654, 655 (1962).  Only disputes between the parties over facts that might

affect the outcome of the case properly preclude the entry of summary judgment.  Anderson, 477

U.S. at 247–48.  Accordingly, the court must examine the materiality and the genuineness of the

alleged fact issues in ruling on this motion. Id. at 248–49.

**B. Analysis**

**1. Gender Discrimination Claim**

Plaintiff alleges that defendant discriminated against her on the basis of her gender, in

violation of Title VII – specifically, that Dr. Zeigler gave her a lower performance evaluation for

the 2009-10 academic year as a result of her request, in February 2010, for paid maternity leave.

Defendant contends that it is entitled to summary judgment on plaintiff's gender discrimination

claim because (1) the evaluation had no effect on the terms or conditions of plaintiff's

employment; and (2) plaintiff cannot show that the evaluation was lowered because of her

request for paid maternity leave. The court need not consider whether plaintiff's evaluation was lowered due to her leave request, because plaintiff's evaluation had no effect on the terms and conditions of her employment.

Title VII makes it unlawful for an employer to discriminate against an individual on the basis of sex. See 42 U.S.C. § 2000e-2(a)(1).

> Generally speaking, a plaintiff may avert summary judgment and establish a claim for intentional . . . [gender] discrimination through two avenues of proof.
>
> First, a plaintiff may establish a claim of discrimination by demonstrating through direct or circumstantial evidence that . . . [unlawful] discrimination motivated the employer's adverse employment decision. The employee, however, need not demonstrate that the prohibited characteristic was the sole motivating factor to prevail, so long as it was a motivating factor. In such cases, historically referred to as "mixed-motive" cases, it is sufficient for the individual to demonstrate that the employer was motivated to take the adverse employment action by both permissible and forbidden reasons.
> . . . .
> The second method of averting summary judgment is to proceed under a "pretext" framework [as set forth in the Supreme Court's seminal case McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)], under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination. . . . If a prima facie case is presented, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Assuming the employer meets this burden of production, . . . the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination. At this point, the burden to demonstrate pretext merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination. Thus, the McDonnell Douglas framework serves to bring the litigants and the court expeditiously to this ultimate question.

Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85 (4th Cir. 2004) (en banc) (internal citations and quotation marks omitted).

"Regardless of the route a plaintiff follows in proving a Title VII action, . . . the existence of some adverse employment action is required. This court has set forth clearly what constitutes

8

an adverse employment action. An adverse employment action is a discriminatory act which 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (internal citations and footnotes omitted) (quoting Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001).

In the context of performance evaluations,

> '[a] downgrade . . . *could* effect a term, condition, or benefit of employment' if it has a tangible effect on the terms or conditions of employment. However, a poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment. An evaluation merely causing a loss of prestige or status is not actionable.

Id. at 377 (emphasis in original; internal citations omitted).

Here, plaintiff contends that the lowered evaluation affected her financially, professionally, and emotionally and led to her ultimately resigning from her position at UNCP. Specifically, plaintiff argues that the lowered evaluation disqualified her from the maximum raise available, diminished her professional standing with her colleagues and prospective employers, and indicated that she would no longer be evaluated objectively. She also argues that Dr. Zeigler's change in tone after she requested leave supports her contention that the terms and conditions of her employment changed. The court finds that the evidence does not support plaintiff's contention that the lowered evaluation had a tangible effect on the terms or conditions of her employment.

First, plaintiff concedes that the North Carolina General Assembly did not grant raises to state employees in 2010. Nevertheless, without supporting authority, plaintiff argues that Dr. Zeigler's intent for her to receive a lesser raise is controlling. The court cannot agree, where no decrease in pay or diminished raise actually resulted from the lowered evaluation, *i.e.,* defendant

never "subsequently use[d] the evaluation as a basis to detrimentally alter the terms or conditions of the [plaintiff's] employment." James, 368 F.3d at 377 (quoting Spears v. Mo. Dept. of Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000)). Next, plaintiff's allegations of diminished professional standing with her colleagues and prospective employers is speculative and unsupported by the record. Moreover, "[a]n evaluation merely causing a loss of prestige or status is not actionable." Id. Finally, the fact that plaintiff perceived that she would no longer be evaluated objectively is not a tangible effect on the terms or conditions of her employment. See id. ("[S]peculation about the future adverse consequences of [an action] may not rise to the level of a genuine dispute.").[1]

In sum, plaintiff has failed to show that she suffered an adverse employment action, and defendant is entitled to summary judgment on the gender discrimination claim.

**2. Retaliation Claim**

Plaintiff alleges that defendant retaliated against her after she filed a gender discrimination charge with the EEOC in June 2010 – specifically, that defendant denied her paid maternity leave for the Fall 2010 semester, designed the job search for a position that she sought to preclude her from successfully applying, and created a hostile work environment. Defendant contends that it is entitled to summary judgment on plaintiff's retaliation claim because she has failed to make out a *prima facie* case of retaliation.

---

[1] It is also noteworthy that plaintiff was never given a negative evaluation. While plaintiff's rating was lowered from "very good," it still remained "adequate," and the Fourth Circuit has found no adverse employment action when an employee's performance score, though diminished from earlier evaluations, remained within a "fully acceptable" rating. See Whitaker v. Nash Cnty., No. 5:11-CV-15-FL, 2012 WL 3840375, at *10 (E.D.N.C. Sept. 5, 2012), aff'd, 504 F. App'x 237 (4th Cir. 2013) (citing Thompson v. Potomac Electric Power Co., 312 F.3d 645, 652 (4th Cir. 2002); Spears, 210 F.3d at 854.

Title VII makes it unlawful for an employer to discriminate against any employee "because [she] has opposed any practice made an unlawful employment practice by [Title VII], or because [she] has made a charge . . . under [Title VII]," 42 U.S.C. § 2000e–3(a).

> To succeed on a retaliation claim, a plaintiff must prove that (1) she engaged in a protected activity, (2) the employer acted adversely against her, and (3) there was a causal connection between the protected activity and the asserted adverse action. . . . An adverse action is one that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits. In addition, [plaintiff] must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011) (internal quotations and citations omitted). As with Title VII discrimination claims, "[i]f a plaintiff puts forth sufficient evidence to establish a prima facie case of retaliation and a defendant offers a non-discriminatory explanation for his [action], the plaintiff bears the burden of establishing that the employer's proffered explanation is pretext." Id. Within this framework, the court will consider plaintiff's retaliation claim.

There is no dispute that plaintiff engaged in protected activity when she filed with the EEOC a charge of gender discrimination against defendant. See Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 656 (4th Cir. 1998) (citing Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994) (filing a complaint with the EEOC is a protected activity)). Rather, the questions presented here are whether defendant acted adversely against her and, if so, whether there was a causal connection between the protected activity and the asserted adverse action.

### a. Denial of Paid Maternity Leave

Plaintiff contends that as the result of filing her first EEOC charge, on June 11, 2010, she was denied paid maternity leave. Defendant does not appear to challenge that the denial of paid

11

maternity leave would constitute an adverse employment action against plaintiff, but rather contends that plaintiff cannot produce sufficient evidence to establish a causal link between the filing of her EEOC charge and the denial of her paid leave request.

Plaintiff first requested paid maternity leave, pursuant to defendant's FSIL policy, in February 2010 for the Fall 2010 semester. See Decl. of David Zeigler ("Zeigler Decl.") ¶ 11 & Ex. 4 (DE # 25-1). Dr. Zeigler initially responded that plaintiff's employment status for the Fall 2010 semester depended on her timely completing her Ph.D., but that if she did so he would approve her medical leave request. See id., Ex. 5. However, after consulting with the dean and the provost, Dr. Charles Harrington, Dr. Zeigler informed plaintiff on March 11, 2010, that Dr. Harrington would not approve her leave request. See id., Ex. 7. Thus, plaintiff was first notified that her leave request would be denied prior to her filing of the EEOC charge on June 11, 2010.

Plaintiff was subsequently informed, on March 22, 2010, and April 7, 2010, that her request for leave could be reconsidered once her employment status for the Fall 2010 semester was resolved. See id., Ex 8 & 9. After plaintiff failed to timely complete her Ph.D., she was offered a one-year position as a lecturer, which she accepted on July 22, 2010, and, thereafter, she renewed her request for paid leave for Fall 2010. A new interim provost, Dr. William Gash, denied plaintiff's renewed request for paid leave on August 4, 2010, and informed her that she could apply for leave without pay under the FMLA. See Decl. of William Gash ("Gash Decl.") ¶ 12 & Ex. 3 (DE # 25-2). Dr. Gash's stated reason for denying plaintiff's paid leave request was that the FSIL policy provided for leave to "exercise primary responsibility for the care of an infant immediately after the birth," and that plaintiff's child was born in April 2010, but her paid leave request was for beginning in August 2010. See id., Gash Decl. ¶ 11.

12

In support of her position that defendant's denial of her paid leave request was retaliatory, plaintiff first claims that defendant admitted in its answer that she was the only faculty member every denied paid maternity leave. This characterization of defendant's answer is not entirely accurate. Plaintiff alleged in her amended complaint that "no other faculty member at UNC-Pembroke had ever been denied *paid* FMLA leave due to a pregnancy." Am. Compl. ¶ 31 (emphasis added) (DE # 11). Defendant admitted in its answer that "no faculty member at UNCP, including Plaintiff, has ever been denied FMLA leave for pregnancy," but added that "FMLA leave is not paid leave, although an employee may be eligible for benefits that provide pay to the employee during FMLA leave." Answer ¶ 31 (DE # 13). Accordingly, defendant did not admit that plaintiff was the only faculty member denied paid maternity leave, and defendant's admission that no other faculty member had ever been denied FMLA leave does not evidence a causal link between the denial of plaintiff's paid leave request and the filing of her EEOC charge.

Plaintiff next claims that at least one faculty member was granted leave the semester after she gave birth and that when plaintiff mentioned this in a July 28, 2010 meeting with Pamela Barkett, the Director of Human Resources at the time, Barkett did not deny the allegation. In response, defendant has presented undisputed evidence that no employee similarly situated to plaintiff had been granted paid maternity leave and that the one faculty member who sought leave for the semester following that in which her child was born received *unpaid* FMLA leave. See Barkett Decl. ¶¶ 10-15. Accordingly, defendant's handling of other employees' leave requests does not evidence a causal link between the denial of plaintiff's paid leave request and the filing of her EEOC charge.

13

Finally, even if the court were to assume, *arguendo*, that such a causal link did exist, defendant has offered a non-discriminatory explanation for the denial, and plaintiff has provided insufficient evidence that the employer's proffered explanation is pretext. Barkett testified that she advised Dr. Gash that plaintiff did not qualify for paid leave under the FSIL policy because her child was born four months prior to the period in which she sought to take leave, <u>see</u> Barkett Decl. ¶ 9 & Ex. 1 (Faculty Handbook § 3-12.E.1(j)), and Dr. Gash testified that he denied plaintiff's request on that basis, <u>see</u> Gash Decl. ¶ 11.

Plaintiff suggests that defendant's explanation is pretext, because another faculty member was granted leave the semester after she gave birth and the FSIL policy was not mentioned as a reason to deny her leave prior to her filing the EEOC charge. As discussed above, plaintiff was not, in fact, treated differently than other similarly situated employees who requested leave, as the other employee referenced by plaintiff was granted unpaid leave. Furthermore, Dr. Zeigler testified that he was unfamiliar with the FSIL policy at the time plaintiff's first request for leave, which was prior to the filing of her EEOC charge, and was considered and denied for alternative reasons. <u>See</u> Zeigler Decl. ¶ 6. Accordingly, plaintiff has provided insufficient evidence that defendant's legitimate, non-discriminatory explanation is pretext.

### b.    Assistant Professor Position

Plaintiff next contends that, in retaliation for the EEOC charge, defendant designed the search for the assistant professor position with an accelerated search schedule to preclude her from successfully applying. Defendant argues that the evidence does not support plaintiff's contention, and that it was plaintiff's withdrawal of her application that precluded her from being hired.

14

The court agrees the evidence does not support plaintiff's contention that defendant designed the search process to preclude plaintiff from successfully applying. As an initial matter, plaintiff was informed prior to filing her EEOC charge that if she did not timely complete her degree, her position might be terminated or converted to a lecturer position. See Zeigler Decl. ¶ 10 & Ex. 3. Plaintiff was also informed that an open search for the assistant professor position would occur and plaintiff could apply if she had completed her degree at that time. See id. In accordance with this prior information, when plaintiff failed to timely complete her degree after filing the EEOC charge, she was not terminated as she could have been, but was instead offered a position as a lecturer. See Zeigler Decl. ¶ 27. Defendant also initiated an open search for the position, indicating that preference would be given to applications submitted by October 15, 2010. See id. ¶ 31-32 & Ex. 14. Thus, the record does not support a causal link between the EEOC charge and any alleged impediments in the design of the search process.

Plaintiff posits that had the search been conducted in conformity with prior searches for tenure track position, which lasted at least a full semester, she would have satisfied the Ph.D. requirement within the appropriate time frame, as she successfully defended her dissertation on December 13, 2010. This argument is flawed, however, because plaintiff did, in fact, apply for the assistant professor position and she was contacted by the search committee regarding her application in February 2011, but responded that she had withdrawn her application from consideration. See Zeigler Decl. ¶¶ 32-34; Dep. of Rachel McBroom, 62:3-4, 66:13-16, & 71:7-14. Because plaintiff applied for the position and subsequently withdrew her application prior to the completion of the hiring process, the fact that plaintiff's application was ultimately unsuccessful is not attributable to a retaliatory hiring scheme, but rather to her own actions. See

Smith v. Bd. of Trustees, St. Mary's Coll. of Maryland, 1998 WL 417290, at *2, 155 F.3d 561 (4th Cir. 1998) (affirming district court's conclusion that plaintiff could not state claim under Title VII, where she had withdrawn her application for promotion before the Board of Trustees could consider it); Gibbs v. Smitherman, No. 4:10-CV-186-BR, 2012 WL 6093805, at *7 (E.D.N.C. Dec. 7, 2012) (concluding that failure to hire was not attributable to discrimination where plaintiff elected to take early retirement before the position was filled).

Plaintiff's belief that she would not have been hired because Dr. Zeigler told her she would be "down the list" in terms of consideration is speculative and is undermined by the fact that she did apply and was ultimately contacted by the hiring committee regarding the position. See Smitherman, 2012 WL 6093805, at *7 n.7 (noting that speculation that plaintiff would not have been hired as proof that the hiring process was a sham is "too tenuous to create a genuine dispute of material fact as to whether it was futile for her to remain in the applicant pool.") Accordingly, plaintiff has failed to present sufficient evidence of a causal link between her unsuccessful application for the assistant professor position and the filing of her EEOC charge.

### c. Hostile Work Environment

Plaintiff finally contends that as the result of filing her first EEOC charge, Dr. Zeigler created a hostile work environment–specifically, that he changed his tone as to whether she could move to a lecturer position if she did not timely complete her Ph.D., accelerated the hiring process for the assistant professor position to discourage her from applying, denied her paid leave that had been granted to other employees, and lowered her evaluation. Defendant contends that there is no evidence that Dr. Zeigler did anything to create a hostile work environment for plaintiff.

16

"A 'hostile work environment' is also often referred to as an 'abusive work environment.'" Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 184 (4th Cir. 2000) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986)). "Title VII 'prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive.'" Patterson v. Cnty. of Fairfax, 215 F.3d 1320 (4th Cir. 2000) (quoting Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 773 (4th Cir. 1997)). The conduct alleged by plaintiff–Dr. Zeigler's change in tone regarding her future job prospects with defendant, accelerating the hiring process for the assistant professor position to discourage her from applying, and lowering her evaluation–even when viewed in the light most favorable to her, is not sufficiently severe or pervasive to alter the conditions of employment. See Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996) (working environment must be "hostile or deeply repugnant," not "merely unpleasant," to be actionable). Accordingly, the alleged hostile work environment cannot form the basis for plaintiff's retaliation claim.

In sum, plaintiff has failed to establish a *prima facie* case of retaliation based on defendant's denial of her request for paid leave, her unsuccessful application for the assistant professor position, and the alleged hostile work environment.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment (DE # 25) is GRANTED. The Clerk of Court is directed to issue judgment in favor of defendant and to close this case.

SO ORDERED, this the 24th day of June, 2013.

LOUISE W. FLANAGAN
United States District Judge